Good morning, Your Honors. May it please the Court, my name is Alan Hutchison. I'm here on behalf of the petitioner, Alina Davis. There are two basic issues before the Court in this case. The first is jurisdiction, and the second is credibility. So let me discuss jurisdiction first. Alina, the petitioner, did not file her application for asylum within the one-year period. She claimed ineffective assistance of counsel, in fact, ineffective assistance of three different lawyers in Reno, Nevada. She followed the procedures outlined in the Code of Federal Regulations. She filed a full affidavit explaining what advice she had been given. She sent that to the attorneys and gave them an opportunity to reply to it. And then she made three formal complaints to the State Bar of Nevada. Now, under the Code of Federal Regulations, as I understand it, if you follow those procedures, that establishes extraordinary circumstances to lift the one-year bar. Now, when we went before the immigration judge, he added a fourth requirement, and that was he could not accept this until the State Bar had formally adjudicated the three complaints. Now, there's nothing in the Code of Federal Regulations or in the case law indicating a requirement that the complaints made with the Bar Association actually be adjudicated. Roberts. Counsel, there are several things I have trouble following on this. I suppose the least of them is the lateness. You're supposed to file for asylum within a year. Ideally, you show up at the border station and say, or at an American embassy and say, I need asylum even before you get here. And she didn't. Now, that facilitates just sneaking in and hiding out, and then if you get caught, filing for asylum. Her excuse is she didn't know she had to because she got bad advice. It doesn't seem like much of an excuse. Now, it seems like what the IJ is doing is giving her an opportunity to show that the excuse is better than it looks by getting a bar adjudication, that the lawyers really did give her this bad advice. What am I missing on that part? Well, what you're missing, Your Honor, is that she didn't come in seeking asylum. She came in under a K-1 fiancé visa with a man she had met in Moscow who had proposed marriage to her, who had filed the proper applications. She was granted the visa. She came to the United States with a full intention of marrying the ‑‑ I think she did marry him, then she dumped him. No, she did not marry him because after she arrived, this individual said, I cannot go ahead with the marriage because I am HIV positive and I have a drug problem. So it was a different one that she married and dumped. Well, she then consulted an attorney who said, well, the best thing you can do is to marry another American citizen within the 90‑day period because under the law you must marry your petitioner within. That is incorrect advice. She asked him about asylum and said, no, it's better that you marry someone. So she went out, followed that advice and married him. And then she followed the Lozada procedure? Excuse me? Yes. And she followed the procedure. And she went through three attorneys. She went to file an adjustment of status. The attorney took the fees, never filed it. They went to the immigration service and said, well, you're not eligible for adjustment of status because you are not married to your original petitioner under K‑1. And so you're relying on the HUSIEV case, H-U-S-Y-E-V? No, Your Honor, I'm not. I mean, K‑1s are special categories. Basically, when they come in, they must marry the person who petitioned them, or if they have a well‑founded fear of returning to their country of origin, they should file an application for asylum. So how can she fault her lawyers for not seeking an adjustment of status when they couldn't because of that rule that you dance with the one that brung you? Well, the attorney who did the adjustment of status knew she was a K‑1 and knew that she was not married to the original petitioner, and in those cases it's very clear she must return to her home country and go through consular processing. Now, let me ask about the asylum. This is a woman. She keeps having perfectly innocent conversations with people driving by in cars, and every now and then she gets abducted and gets away without anything happening to her. So she's afraid if she goes back, the Muslims will rape, torture, and kill her. I didn't get the therefore. Why is she afraid that the Muslims would rape, torture, and kill her? Well, she was abducted and raped on one occasion, gang raped, Your Honor, on the third occasion, and she lives in the Caucasian region of Russia surrounded by Muslim states, and Muslims claim these are orthodox Russians within Muslim territory, and particularly she borders on Chechnya, and there's articles in the newspaper every day about the violence going on in Chechnya. She certainly has a well‑founded fear of returning. Now, if you take her statements at face value and accept them, she's had some traumatic events, but the issue is, was this just random, that is, people who are violating rights of women on, what was it, three occasions, or was it because of her religion? And she claims, of course, and has to claim that it is due to her religion or she can't receive any benefits under the law. So she's an orthodox Christian. There isn't one word of anything from their captors that they were doing this because she was a Christian. It looks like, from the record, they were doing it because they're just bad people doing things, unfortunate things to women. How does she prove, from this record, that it was because of her religion and only because of her religion that this occurred? Well, it wasn't only because of her religion. It was both because she is a great Russian, so there's ethnicity, and it's also on religion because she's Russian orthodox. And the animosity between the Muslims and the Russians who occupy territory that they think is historically theirs exists in that area. Was there anything in the events that suggested that the reason they were doing this was because she was a Russian or because she was Russian orthodox? I believe so. Where was it? I didn't see it. Where does it say, if you'd been some other religion, if you'd been a Muslim, or you didn't have any religion, we wouldn't do this to you? We're doing it because of your religion. Well, there's nothing in the record that states that explicitly. I think it's implicit. Well, where does it state it implicitly? Well, implicit is the fact that they took her off of the streets in Russia, took her back into the Muslim state, and there gang-raped her. And fortunately, she escaped. And all the comments that were made indicate they're not doing this to Muslim women. They're only doing this to Russian women. So if it had been a Russian woman who was an atheist, the same thing would have happened? Well, at that point, I think it's both the ethnicity of being a so-called great Russian and also the fact that you're an orthodox Christian rather than Muslim. If one of us is the victim of a crime during our stay this week in San Francisco, should we infer that it's because of our ethnicity or religion? Not necessarily, Your Honor, but this is different circumstances. This is the Caucasian region of Russia, which is just rife with violence. Just in the last two or three weeks, there have been a number of violent acts reported in Chechnya. So it's a very dangerous area. And she had three incidents. And this is also very close to the area where those Russian children were kidnapped and held hostage in the school, where railways have been blown up, and Russians are not free to live wherever they want. So all crime in areas that are not in Chechnya but aren't far from it is motivated by ethnicity or religion? There appears to be, yes, Your Honor. Nice that they don't have any regular criminals there. That I don't know. I mean, we have the question of credibility. The judge did not find her creditable. And the reason he did not find her credible is because she testified in a very relaxed manner and did not display any emotion. And I don't think that's a proper basis for a non-credibility finding. I mean, it reminds me a little bit, just the lamplighters here in town, just recently did My Fair Lady, reminded me when the other speech expert claimed Eliza was a fraud because her English was too perfect. In this case, her testimony was too perfect. But we are dealing with a very well-educated woman here. She has a graduate degree in pharmacy from Russia. And while she was in the United States, she did obtain a master's degree in public health from the University of Nevada. So it just stands to reason that she'd give testimony. And then we have the additional factor, which did not come out in the trial, in that after she was raped, she attended a center in Moscow called the Sisters Center for Psychological Help to Women and claimed while she was there, the therapy is to repeat these traumatic events over and over. They declined to provide documentation corroborating her claim. Is that right? Well, we did not submit that at the court, Your Honor, because I handle the case at court. And I did not know that because my experience as an immigration lawyer has been when you're handling victims of trauma and torture, they don't tell you everything. And it came out afterwards. Thank you, Counselor. Your time has expired. Thank you. Let's hear from the government. May it please the Court. Joan Smiley here on behalf of the United States Attorney General. The first issue of jurisdiction, I think Judge O'Scanlan referred to the Husieff case. And under that case and Ramadan, the court has held that it does have jurisdiction to review the issue of whether extraordinary circumstances can excuse the untimely filing of an application for asylum. Here, however, as we indicated in our brief, there are disputed facts regarding the circumstances, which whether they're sufficient or insufficient to demonstrate extraordinary circumstances and excuse the delay. Specifically, the immigration judge found the petitioner's testimony not credible. He indicated that it seemed rehearsed, memorized, like she was reading from a script. Ms. Davis admitted that she perpetrated a fraud in entering the United States. The judge determined that her efforts to obtain status through three successive, first the relationship and then two rapid marriages after the first relationship and three quick divorces to different men, and then applying as a battered spouse, could not be attributed to efforts to avoid persecution. Rather, they were efforts to get around the law concerning the fact that she had entered fraudulently with a K-1 visa as a fiancé and then two other men that she chose to marry. Would you go back just for a minute to the credibility finding? We have a lot of difficulty with these, and our cases have not made it easy for us. But there is some law that says that demeanor can be important as a reason. Under our law, there has to be just one reason given for which there is substantial evidence. I take it that what the government is contending is that this is a reason for which there is substantial evidence. I'd like to have you go a little further into that, if you would, because our cases have made it very difficult for this, and some of us have been trial judges before, and we know it is not an easy thing to determine who's telling the truth. What is the test for that demeanor evidence, and how is it met by this ALJ? Well, I believe this Court's decision in Sarvia Quintanilla described the demeanor evidence that the administrative judge is in the best position to witness, i.e., the way the alien presents themselves, the way they testify, what they say, what's in the record. And in this case, as I indicated, her testimony seemed very rehearsed, memorized, as if she were reading. It displayed no emotion whatsoever. In addition, the judge looked at the fact that she admitted that she entered fraudulently. This went to her credibility as well, in addition to the demeanor that he witnessed when she was testifying. What was the fraud? Was it lack of intention to marry this person, or maybe she knew in advance that this person had these other issues? Possibly. The record evidence is that she went to a social gathering in Moscow that was arranged for American men to meet Russian women who were interested in marriage. Five days later, they decided they would get married. They applied for the K-1 visa. She came here a few days later. She decided not to marry him. She indicated that he told her he was HIV positive and he was a drug abuser. Well, I'm not sure that's fraudulent on its face, but if there were more evidence, I suppose that would support it. Well, that was what the notice to appear charged, and she admitted the allegation. She did, okay. Yes. In addition, the judge, in finding that she failed to provide any credible evidence that would justify the six-year delay in applying for asylum, he looked at the fact that she attempted to blame three different attorneys for the six-year delay and found the evidence that she presented unpersuasive. The three attorneys disputed her claims. That's in the record evidence. In fact, one attorney provided an affidavit, which is at page 300 of the record, indicating that he never represented Mrs. Davis, never took a retainer, that it was possibly just a consultation that he provided. He also stated in his affidavit that he has practiced immigration law for 25 years and he would never have advised she or anyone else that she could marry someone other than the individual indicated in the K-1 visa. So that really is a disputed fact here in the record. The two other attorneys also disputed her claim. Furthermore, importantly, the board found insufficient evidence that the three incidents that she claims occurred in Russia occurred were on account of a protected ground. Before you go to those, come back, if you would, please, to the Lozada follow-up. I've never heard of a rule that Lozada requires the state bar or whatever the organization is that they send their complaint to, to actually have a trial and make a finding before they can go forward. It seems to me in the Lozada cases I've seen, the requirement is that you advise the state bar. Was it ALJ right that they must wait until these three petitions about malpractice are completed by the state bar? Judge Wallace, it's correct that Lozada does not impose that requirement. However, neither did the immigration judge here. He noted that the Nevada state bar had not made a decision on these three claims against the lawyers, and he indicated in addition that he is not in a position to judge whether her story is correct or the attorney's story might be correct. He didn't impose the requirement. He simply indicated that there had been no resolution to these three bar complaints. Where will I find that in the record? That would be in the immigration judge's decision, which can be found at pages 58 to 74 of the record. Someplace in there. Oh. It's okay. I've got a competent law clerk to find it for me. I miss this part, and I'm curious. How come he decided she was a liar? How come he was unwilling to decide that she was a liar with respect to it all being the lawyer's fault that she didn't apply for asylum within a reasonable time? Well, again, he didn't have the only submission that was in the record was the response from the one attorney. That's at page 300 of the record. I would have thought, unless there was something that made him think maybe she's telling the truth about that, that he'd go by falsus in unum, falsus in omnium, that he'd say, well, gee, you're a liar about everything else, the lawyer's dispute, your claim that it's all their fault that you didn't apply for asylum for six years, and I don't believe you on that either. I think in the abundance of caution, the judge was simply. He was cautious. What it does is it leaves open the question about extraordinary circumstances. Well, the judge concluded there were no extraordinary circumstances, and the board agreed with that determination. Which would be a lot more obvious if he thought and said that she was lying about the supposed bad advice that the lawyers gave her. So I'm wondering, is there some glitch there? And I don't get what it is. Well, the judge, I think, indicated that he's not in the best position to resolve the bar complaints. He just heard the whole thing, and he's got the stories from both sides. He's got what the lawyers say and what she says. But as far as the bar complaint, the Nevada bar is in the best position to weigh all of the evidence submitted. The judge did not have before him all the submissions from the two other attorneys, which may have completely disputed what she said. There is the indication in the record that they disputed her claims. I just don't get it. He knows more than the bar lawyers. Well, he knows all about these phony marriages and asylum claims and the whole story in Russia and all that. I don't understand the reluctance to make a fact-finding on that, and I'm wondering if I'm missing something or misunderstanding something. Well, it would be speculation, but it appears that since the other two lawyers' submissions were not before him, he may have felt that he did not have the complete record that the Nevada bar would have before it. In addition, Judge Wallace's observation about random violence in Russia I think goes back to the Martinez-Romero case in which this court held that random violence against the general populace would not be sufficient to establish a basis for asylum. Unless the panel has any other questions, the government would rely on the brief. Thank you, counsel. The case just argued will be submitted for decision.
judges: Wallace, O'scannlain, Kleinfeld